Herbert A. **THOMPSON**

v.

Vernon L. **PEPERSACK, Warden,**
**Maryland Penitentiary.**

**Civ. No. 15496.**

United States District Court
D. Maryland.

July 6, 1967.

Fred E. Weisgal, Baltimore, Md., court-appointed for petitioner.

Francis B. Burch, Atty. Gen., and Frank A. DeCosta, Jr., Asst. Atty. Gen., Maryland, for respondent.

FRANK A. KAUFMAN, District Judge.

Thompson seeks review of his convictions for first degree murder and for rape in his 1962 jury trial in the Criminal Court of Baltimore. Thompson was sentenced to life imprisonment for murder and twenty years for rape. Both convictions were affirmed on appeal by the Court of Appeals of Maryland. Thompson v. State, 230 Md. 113, 186 A.2d 461 (1962). Application for post-conviction relief in the Criminal Court of Baltimore City, and application for leave to appeal

therefrom to the Court of Appeals, were denied. Thompson v. Warden, 233 Md. 643, 197 A.2d 138 (1964).

■ On April 21, 1964, Thompson filed a petition for writ of habeas corpus in this Court alleging: (1) illegal arrest, (2) involuntary confession, and (3) lack of representation by counsel at every stage of the proceedings. In a Memorandum and Order dated April 24, 1964, Judge Winter, sitting in this Court, granted petitioner leave to file in forma pauperis, directed respondent to show cause why a writ of habeas corpus should not be issued as prayed, and also directed respondent to submit to the Court the portion of the transcript of Thompson's trial in the State Court containing the evidence relating to the voluntary aspect of Thompson's statement and the trial court's charge to the jury on the issue of voluntariness. In May, 1964, respondent filed its answer, attaching thereto a transcript of petitioner's trial in the Criminal Court of Baltimore. In June, 1964, Judge Winter entered an order appointing counsel to represent Thompson in this proceeding and directing that the matter be set for hearing. Due to illness of Thompson's court-appointed counsel the hearing was not held until April 1967. At that hearing Thompson and his mother testified.[1] Respondent called no witnesses to testify, electing instead to stand upon its cross-examination of petitioner and his mother as well as the record of the State Court trial.[2] Thompson did not seek to call any of the police officers of whose acts he complained.

During the trial in the State Court a typed statement signed by Thompson was introduced into evidence against him. In this statement petitioner admitted having had sexual intercourse with one Ann Welsch in a vacant lot at approximately 12:00 P.M. on the night of November 19, 1961 and that Ann Welsch had scratched him on the left cheek.[3] Other evidence was introduced by the State showing that the body of Ann Welsch was found on the lot during the morning of November 20, 1961, that Ann Welsch had been forcibly raped and had died as a result of injuries sustained during the rape, or from overexposure, or a combination of the two, and that Thompson had been seen near the scene of the rape several days thereafter with a scratch mark on his cheek. During the trial Thompson's counsel objected to the introduction of his statement on the ground that it had been obtained during the course of interrogation by police officers who had beaten petitioner in order to coerce him into making a statement. At a timely point in the proceedings the trial judge took testimony out of the hearing of the jury with regard to the circumstances surrounding

1. Thompson's mother's testimony was that she noticed marks on her son indicating that he had been beaten when she briefly visited him at the time of the preliminary hearing in the Municipal Court of Baltimore City. Although Thompson's mother testified at the State Court trial, she did not there testify concerning the alleged beating of her son, or of her having noticed evidence of such a beating.

2. "To be sure, the state-court record is competent evidence, and either party may choose to rely solely upon the evidence contained in that record, but the petitioner, and the State, must be given the opportunity to present other testimonial and documentary evidence relevant to the disputed issues." Townsend v. Sain, 372 U. S. 293, 322, 83 S.Ct. 745, 762, 9 L.Ed.2d 770 (1963).

3. In the statement Thompson related that he saw a woman, whom he had previously seen in a store in the neighborhood walking down the street at about 11:30 or 12:00 P.M. and that he approached her and "found out that she was pretty high * * *." Thompson stated that he asked the woman to have sexual intercourse with him, that she did not say anything, that she started walking to the vacant lot with him and that he "held one of her arms and helped her over." Thompson denied that he forced her to have sexual intercourse with him but stated that he had ripped off her underclothing and that as he began to have sexual intercourse with her she told him "stop," and "that's when I stopped the first time and she scratched me on the left side of the face. I pushed her hand away and had intercourse the second time."

the taking of the statement. Petitioner testified that he was beaten in the course of interrogation by the police and that he gave the statement as the result thereof.[4] The State offered testimony tending to show that during the course of the interrogation Thompson was not beaten or threatened in any manner and that the statement which he made was freely and voluntarily given. At the conclusion of this testimony the trial judge overruled the objection of petitioner's counsel to the introduction of the statement but did not make specific findings of fact in support of his ruling. Thompson's statement was then admitted into evidence before the jury and both Thompson and the State put before the jury testimony in connection with the circumstances surrounding the interrogation of petitioner and the taking of the statement, which testimony was largely duplicative of that previously received by the trial judge out of the presence of the jury.[5] The trial judge, in his charge to the jury, instructed the jury that Thompson's statement should be disregarded by them unless they found it to be a voluntary act not induced by hope of favor or fear of harm.[6]

After review of the State Court trial record and consideration of the testimony at the hearing in this Court on April 10, 1967, and having listened to and observed the petitioner and his mother while they were each on the witness stand, and attaching little credibility, if any, to the testimony of either of them, this Court makes the following findings of fact:

1. The dead body of Ann Welsch was found in a vacant lot in Baltimore City on the morning of November 20, 1961. Miss Welsch had been forcibly raped and had died of injuries sustained during the course of the rape, or from overexposure or from a combination of the two.

2. The Baltimore City police in investigating Miss Welsch's death learned from an unnamed informant that petitioner, Herbert A. Thompson, knew Miss Welsch, that he had in the past argued with her, and that he had been seen, several days after the alleged offense, near the scene of the crime with a scratch mark on his cheek.

3. Upon the basis of the above information an order was issued for the arrest of petitioner. Acting pursuant to this order Officer William Butler arrested Thompson without a warrant on December 8, 1961, at 3:10 A.M. at the home of his mother in Baltimore, Maryland. At that time Butler told petitioner that he was wanted at police headquarters for investigation but did not inform him of any charges. Butler took petitioner to Central Police Station in Baltimore. Upon their arrival Officer Butler "booked" Thompson for investigation and placed him in a cellblock.

---

4. At no point in the State proceedings, nor at any point in the proceedings in this Court, has petitioner contended that he did not make the statement or that the statement introduced against him at his trial was not the statement which he made to the police. At his State Court trial and in this Court petitioner admitted having made the statement and having signed it, but contended that the police told him what to say and that he said it only because he was afraid of further beatings.

5. Both in the plenary hearing before the trial judge out of the jury's presence and before the jury, the State called as witnesses Officer William Butler, who had arrested the petitioner, and Detectives Arlie Keefer, Clarence Roy and William

Smith, who had interrogated petitioner after his arrest. In addition, Policewoman Lorraine Burrell, who did not testify during the plenary hearing, testified in the presence of the jury that she had typed petitioner's statement as he dictated it and that petitioner had not been beaten or threatened or otherwise coerced in her presence. The only evidence offered by petitioner at either time with regard to his statement was his own testimony.

6. In this proceeding petitioner makes no claim that the trial judge failed to articulate the proper constitutional standard for determining voluntariness in his charge to the jury. See Townsend v. Sain, 372 U.S. 293, 314–315, 83 S.Ct. 745 (1963).

4. Thompson remained in the cellblock until 9:48 A.M. that same morning (December 8, 1961), at which time he was taken by Detective Sergeant Arlie Keefer to an interrogation room. Prior to this time Thompson had not been questioned by anyone in connection with the investigation of the death of Ann Welsch or in connection with any matter whatsoever.

5. When Keefer and Thompson arrived at the interrogation room, Detectives Clarence Roy and William Smith were in the room. Petitioner was first asked routine questions concerning his name, age, address, etc. Then, he was told that he had been arrested in connection with the investigation of the death of Ann Welsch. Thompson denied any knowledge of the crime and denied knowing Ann Welsch.

6. Thompson was interrogated by Keefer, Smith and Roy until 11:45 A.M. During this period no other persons were in the presence of petitioner.

7. At approximately 11:00 A.M. Thompson was requested to remove his pants. He was wearing three pairs of pants. He removed two pairs of pants, including a pair of women's panties. Roy took these from Thompson and sent them to the police crime laboratory. Roy returned in three or four minutes with a pair of coveralls which he handed to Thompson and which the latter put on.

8. At 11:45 A.M. Roy left the interrogation room to perform duties in connection with another case. At that time Thompson ate a meal, consisting of a sandwich and a cup of coffee, in the interrogation room, without being threatened or coerced into so eating. Keefer was present in the room throughout all of the time, and Smith was present during part of the time, Thompson was eating.

9. At 12:30 P.M. Thompson was taken by Keefer to the Bureau of Identification where he was fingerprinted. Thompson was then placed in a cell in the Bureau of Identification.

10. At 1:45 P.M. Thompson was taken by Keefer and Smith from the cell in the Bureau of Identification to the same room in which he had been previously interrogated that morning.

11. Keefer once again commenced to interrogate Thompson in Smith's presence. Thompson continued to deny any knowledge of facts connected with the circumstances of the crime, until after being successively confronted with information gathered by police which contradicted facts stated by Thompson and which indicated involvement of Thompson in events concerning which he claimed complete lack of knowledge.

12. At 2:30 P.M. petitioner, after being so confronted, orally admitted in the presence of Keefer and Smith, that he was responsible for the rape.

13. Keefer and Smith continued to question Thompson with regard to the commission of the crime. Between 2:30 P.M. and 3:00 P.M. Roy returned to the interrogation room and was present as petitioner elaborated upon his admission.

14. Keefer placed a call requesting that Policewoman Lorraine Burrell come to the interrogation room to take Thompson's written statement. Miss Burrell came into the interrogation room and at 3:10 P.M. petitioner began to give his written statement.

15. During the taking of the written statement Keefer would ask Thompson a question and Miss Burrell would type that question. Petitioner would then answer the question and Miss Burrell would type that answer.

16. During the course of the taking of the written statement Thompson was shown several photographs of the dead woman's face and arms and was asked if he knew how the dead woman had gotten the bruises and cuts shown thereon. This was the first and only occasion during the interrogation upon which Thompson

was shown any photograph or photographs of the dead woman.

17. At 4:20 P.M. the written statement was completed. Thompson was handed the original of the typed statement. Keefer, at petitioner's request, read the entire statement to Thompson from one of the carbon copies which had been typed with the original by Miss Burrell. Smith and Roy followed Keefer's reading from other such carbon copies. Keefer accurately read the statement from beginning to end.

18. At 4:30 P.M. Thompson signed the statement and Keefer, Smith and Roy witnessed his signature.

19. At 4:35 P.M. petitioner was taken by Smith and Roy to the crime laboratory for photographs of his face and upper body, which photographs were in fact taken.

20. At 4:50 P.M. petitioner was placed in a cellblock by Smith and Roy.

21. At 5:45 P.M. Keefer and Roy took petitioner to the scene of the crime. Petitioner showed the detectives where the attack had taken place.

22. At 6:20 P.M. petitioner was returned to a cell in the Central District Station.

23. At no point during the events related above was Thompson beaten or threatened in any manner whatsoever, nor were any promises or inducements whatsoever made or given to him.

24. At no point during the events related above was Thompson advised that he had a right to remain silent, that he had a right to the presence of counsel, and that if he could not afford counsel one would be appointed for him. Thompson was advised during the taking of the written statement that what he said might be used for or against him in court, but was not so advised prior to that time.

25. On December 10, 1961, petitioner was taken before the Municipal Court of Baltimore City, Criminal Division, which

Court held him for arraignment at a date to be set by the State's Attorney's Office.

26. On December 26, 1961, petitioner appeared in the Municipal Court of Baltimore City, Criminal Division, pleaded not guilty to the charges of murder and rape, and was held without bail for action of the Grand Jury. Petitioner was not represented by counsel during this proceeding.

27. On December 27, 1961, counsel was appointed to represent petitioner by the court.

### The Arrest

Thompson contends that he was illegally arrested and that his confession was inadmissible at his trial because it was the direct and immediate result of an unlawful arrest. Thompson argues that the evidence does not show that the information which was in the possession of the police prior to his arrest was sufficient to constitute "probable cause," without which no arrest without a warrant is legal. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1961); Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

■■ In the post-conviction proceeding, the Court of Appeals of Maryland stated that Thompson's arrest appeared not to have been illegal. Thompson v. Warden, supra, 233 Md. at 644, 197 A.2d 138. However, even assuming that the arrest was illegal, such a circumstance would not necessarily render an otherwise voluntary confession inadmissible. In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the United States Supreme Court held in connection with a federal narcotics violation that an inculpatory statement made during the course of an arrest without probable cause was in that case "fruit of the poisonous tree" and therefore inadmissible in evidence. It has not as yet been authoritatively decided whether Wong Sun is applicable to state trials.

See Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 1341 n. 7, 18 L.Ed.2d 423 (1967); Jacobs v. Warden, 367 F.2d 321, 323 & n. 2 (4th Cir. 1966); Ralph v. Pepersack, 335 F.2d 128, 136 & n. 11 (4th Cir. 1964). Neither has it been decided that the rule enunciated in *Wong Sun* automatically works to exclude any admission or confession taken subsequent to an illegal arrest. In this case the connection between the arrest and Thompson's confession was not "so automatic and inevitable that the latter is readily seen as the 'fruit'" of the former. Collins v. Beto, 348 F.2d 823, 835 (5th Cir. 1965) (concurring opinion of Friendly, J., sitting by designation). Viewing the totality of circumstances in this case, this Court finds Thompson's confession was the result of his "own [individual] decision to speak." Collins v. Beto, supra, 348 F.2d at 835 (Friendly, J.).

### Assistance of Counsel

Petitioner contends that he is entitled to the relief prayed on the ground that he was deprived of his right to a fair trial because he was not provided with counsel both prior to interrogation and the taking of his statement and prior to his appearance in the Municipal Court of Baltimore City.

■■ Petitioner was tried prior to the decisions in *Escobedo*[7] and *Miranda*,[8] the rules of which do not directly apply here. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). There is no claim and no evidence that petitioner at any time made a request for counsel prior to his confession which was refused by the police. In cases not governed directly by *Escobedo* or *Miranda,* the failure to inform a suspect prior to in-custody interrogation of right to counsel is a significant factor to be considered in determining the voluntariness of a confession. Clewis v. State of Texas, supra, 386 U.S. at 709, 87 S.Ct. at 1340; Davis v. State of North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). But it is not more than that.

■ In the preliminary proceedings in the Municipal Court of Baltimore City, on December 26, 1961, Thompson pleaded not guilty to the charges of murder and rape. Counsel was not appointed to represent Thompson until the following day, December 27, 1961. Thompson contends that a preliminary proceeding in Maryland is a "critical stage" in a criminal proceeding within the meaning of White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) and Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527 (1932).

In *Powell* seven Negro defendants were charged with the capital crime of rape. They were arraigned without counsel and entered pleas of not guilty on March 31, 1931. There was a severance and the defendants were tried in three separate groups. The Supreme Court found that no lawyer had been named or definitely designated to represent the defendants until the morning of April 6, 1931, six days after the arraignment, and the morning upon which the first of the three trials began. The Court held that this constituted a denial of due process and stated its conclusion

> that during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself. [287 U.S. at 57, 53 S.Ct. at 59].

Manifestly this is not the situation in the instant case. Here counsel was appointed on December 27, 1961, over three

---

7. Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

8. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).

months prior to the beginning of petitioner's trial on March 6, 1962. In holding that the trial judge's failure to make effective appointment of counsel upon the facts present in *Powell* violated due process within the meaning of the fourteenth amendment, the Supreme Court noted that "[w]hether this would be so in other criminal prosecutions, or under other circumstances, we need not determine." 287 U.S. at 71, 53 S.Ct. at 65. Under the circumstances of the instant case, this Court does not find that Thompson was denied due process within the meaning of *Powell*.

In Hamilton v. State of Alabama, supra, a defendant, convicted of the capital offense of breaking and entering a dwelling with intent to ravish and sentenced to death, contended that he was denied constitutional rights because he was not represented by counsel at his arraignment. Defendant had pleaded not guilty at that time. The Alabama Supreme Court held that there was no showing that the defendant had been disadvantaged in any way by the absence of counsel when he interposed a plea of not guilty. The United States Supreme Court reversed, noting that under Alabama law the defense of insanity must be pleaded at arraignment or the opportunity is lost, that pleas in abatement must also be made at that time, as well as motions to quash based on systematic exclusion of one race from grand juries or on the ground that the grand jury was otherwise improperly drawn. From this the United States Supreme Court concluded that "[w]hatever may be the function and importance of arraignment in other jurisdictions, * * * in Alabama it is a critical stage in a criminal proceeding." 368 U.S. at 54, 82 S.Ct. at 158. For that reason the Court concluded that Hamilton's constitutional rights had been violated in not being represented by counsel at his arraignment. In White v. Maryland, supra, an accused appeared at a preliminary hearing without representation by counsel and pleaded guilty. At his later arraignment, when represented by counsel, he entered pleas of "not guil-

ty" and "not guilty by reason of insanity." At his trial the plea of guilty made at the preliminary hearing was introduced in evidence. The United States Supreme Court stated as follows:

> Whatever may be the normal function of the "preliminary hearing" under Maryland law, it was in this case as "critical" a stage as arraignment under Alabama law. For petitioner entered a plea before the magistrate and that plea was taken at a time when he had no counsel. [373 U.S. at 60, 83 S.Ct. at 1051].

The problem dealt with in *White* is not presented in this case in which Thompson entered pleas of not guilty at the preliminary hearing, and maintained his innocence throughout all of the state court proceedings and during this proceeding.

■■ The contention that the preliminary proceeding at which Thompson was not represented by counsel was a "critical stage" within the meaning of the *White* and *Hamilton* cases is an argument which Thompson raised in his application for leave to appeal in the post-conviction proceedings. The Maryland Court of Appeals at that time rejected the contention on the ground that the *White* case was inapplicable since Thompson pleaded not guilty in the preliminary proceedings. Thompson v. Warden, supra, 233 Md. at 644, 197 A.2d 138. Thompson's reiteration of that contention in this federal habeas corpus proceeding constitutes the same argument rejected by this Court in In re DeToro, 222 F.Supp. 621 (D.Md. 1963) (opinion of Northrop, J., in which Thomsen, C. J., Watkins and Winter, JJ., concurred), aff'd sub nom. DeToro v. Pepersack, 332 F.2d 341 (4th Cir. 1964), cert. denied, 379 U.S. 909, 85 S.Ct. 198, 13 L.Ed.2d 181 (1964). The *White* and *Hamilton* cases, and the irrelevance of both in connection with preliminary proceedings in Maryland at which the accused enters no plea or enters a plea of not guilty, were discussed at length in *DeToro* by Judge Northrop in this Court and also by Judge Bell, writing for the Fourth Circuit Court of Appeals in af-

firming on appeal. A preliminary proceeding under Maryland law in which an accused has pleaded not guilty does not constitute a "critical stage" within the meaning of *White* and *Hamilton* and the fact that the accused was not represented by counsel at the time he entered such plea does not entitle him to relief in a federal habeas corpus proceeding.

### Voluntariness of Confession

■ As discussed above, since this case came to trial before the effective date of either *Escobedo* or *Miranda,* the standard to be applied by this Court in determining the admissibility of petitioner's statement is that of voluntariness. Clewis v. State of Texas, supra, 386 U.S. at 709, 87 S.Ct. at 1339.

■ Detailed findings of fact have been stated above in this opinion. Missing from this case are instances of police brutality or excesses during the course of prolonged interrogation. Compare, e. g., Clewis v. State of Texas, supra; Davis v. State of North Carolina, supra; Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). What is presented here instead is a case in which an individual suspect of reasonable intelligence and awareness confessed to a crime after interrogation of reasonably limited duration under circumstances consonant with acceptable police practices in the pre-*Escobedo* and pre-*Miranda* periods. The possibility that at the time of the confession Thompson was detained pursuant to an arrest without probable cause and the fact that at the time the statement was taken Thompson had not been advised of any of the rights spoken of in *Escobedo* and *Miranda,* have been carefully reviewed as part of the totality of the circumstances of this case. Upon such consideration this Court holds that Thompson's statement was voluntarily given.

For the reasons stated above, the petition for writ of habeas corpus in this case is denied.