**Cecil C. PHILLIPS, Petitioner,**

v.

**OCONEE COUNTY et al., Respondents.**

Civ. A. No. 69–497.

United States District Court,
D. South Carolina,
Columbia Division.

Oct. 14, 1969.

————◆————

Kermit S. King, Columbia, S. C. (court-appointed), for petitioner.

Daniel R. McLeod, Atty. Gen. of South Carolina, and Emmet H. Clair, Asst. Atty. Gen., Columbia, S. C., for respondents.

## OPINION AND ORDER

DONALD RUSSELL, District Judge.

Petitioner, a State prisoner serving a twenty-five-year sentence imposed following a guilty plea entered on November 10, 1965, to a charge of rape,[1] seeks relief in *habeas corpus*, contending that his plea was involuntary.

He has heretofore been denied relief by way of *habeas corpus* proceedings in the State Court.

In his State Court *habeas corpus* proceeding, filed September 27, 1966, petitioner based his claim of involuntariness in his plea on two contentions: (1) That it was forced by the threat of his counsel to withdraw and he "would have no counsel" if he refused so to plead; and (2) that he was induced to enter such plea by the false promise of his counsel that his sentence, should he plead guilty, would be ten years.[2]

---

1. Section 16–72, Code of South Carolina (1962).

2. See, p. 30, State Transcript.

On such pleas, the petitioner was accorded a full evidentiary hearing by the State Court.[3]

The record in the State *habeas* hearing [4] established that the petitioner was indicted on the charge of rape at the October, 1965, term of the Court of General Sessions of Oconee County, South Carolina.[5] He was not immediately arrested. Some of the evidence indicated he became a fugitive, fleeing to North Carolina to avoid arrest.[6] Petitioner himself testified he was ignorant of the indictment and was not seeking to avoid arrest by going to North Carolina. At any rate, he subsequently surrendered and was released on bond.[7] He retained Ernest L. Branham, Esquire, to represent him in the prosecution.[8] Mr. Branham secured a preliminary hearing at which both the complaining witness and her mother testified.[9] When the Court of General Sessions for Oconee County convened on Monday, November 1, 1965, the Solicitor advised counsel for the petitioner that he wished to dispose of the case against the petitioner during that two-weeks term of criminal court.[10] Mr. Branham in the meantime associated E. Harry Agnew, Esquire, in the defense at the instance of petitioner's family.[11] On Tuesday, November 2, counsel moved for a continuance, which motion was denied by the Court.[12] Thereafter, on the same Tuesday, the petitioner was arraigned and stated, according to the Solicitor, he wished to plead guilty [13] but requested that the plea be delayed until the second week, when the number of people in court would be considerably reduced and there would be less notoriety connected with his plea.[14] The petitioner denies such conversation and his counsel were not examined on the point. At any rate, the case against the petitioner was continued over until the second week.

The petitioner conceded that it was understood between him and his wife on Saturday, November 6, that he was to plead guilty.[15] On Sunday following, he had an extended discussion with his counsel at the home of Mr. Branham. This discussion began at about 9:30 o'clock in the morning and extended over a period of several hours.[16] Mr. Branham had earlier, according to his testimony, made diligent inquiries into the reputation of the complaining witness and had been unable to secure any evidence reflecting upon her moral character or impeaching her account as given at the preliminary hearing.[17] The testimony at the preliminary hearing had been recorded on tape and this record was played back and listened to by the petitioner and his counsel. Petitioner was asked by his counsel what answer he would make in his testimony to this testimony of the complaining witness. It was the testimony of his counsel that petitioner told them he refused to take the stand and would not testify.[18] Counsel then inquired what witnesses they might use in defense. According to them, petition-

---

3. At this hearing, petitioner was represented by retained counsel. There was, however, some confusion about the representation, since the petitioner had also acted by filing *pro se* his own petition. Pages 1–6, State Transcript. Both petitions, however, raised the same points.

4. This record was introduced in evidence in the hearing before me. In any event, it is proper to look to such record in considering, on application to a federal court, a petition in *habeas corpus*. Townsend v. Sain (1963) 372 U.S. 293, 322, 83 S.Ct. 745, 9 L.Ed.2d 770; Thompson v. Pepersack (D.C.Md.1967) 270 F.Supp. 793, 795, note 2.

5. See p. 8, State Transcript.

6. See pp. 110, 138, State Transcript.

7. See p. 121, State Transcript.

8. See pp. 110–11, State Transcript.

9. See pp. 107, 121, 126, State Transcript.

10. See p. 167, State Transcript.

11. See p. 122, State Transcript.

12. See p. 117, State Transcript.

13. See p. 180, State Transcript.

14. See p. 167, State Transcript.

15. See p. 17, State Transcript.

16. See pp. 100–2, State Transcript.

17. See pp. 107–8, 125, State Transcript.

18. See pp. 109–10, 132, State Transcript.

er gave them the name of one person, who petitioner said was at some unknown address in California and not available at the trial.[19] At this point, counsel seemed convinced that petitioner was not being frank with them. With no basis for impeaching the complaining witness,[20] with no witnesses,[21] and with their own client refusing to testify,[22] they told him that, unless he could give them some basis in fact for a defense and provided them with the truth, they wished to withdraw.[23] This seemed agreeable to petitioner[24] and counsel refunded the fee they had previously been paid.

There is conflict on events later on this Sunday. Mr. Branham testified that a nephew of petitioner called him on that Sunday afternoon advising that his uncle wished to be frank with his lawyers and to meet with him (Branham) at West Union (a suburb of Walhalla) on that afternoon to discuss further the case.[25] The petitioner's version was that he had a conversation with Mr. Branham later on this Sunday afternoon and that Branham told him that, if he would show him a "place", he would resume the defense.[26] He was silent on how this meeting with Branham was arranged. Whatever the circumstances leading up to it, a meeting of the petitioner and Branham did occur that afternoon and the petitioner took Branham to a "place", which was a small wooded area outside the Town of Walhalla.[27] Petitioner contended it was just a "place". Branham testified that, when he met with the petitioner, the latter admitted the crime and proceeded to take Branham to the "place",

as the petitioner described but, as Branham understood it, the scene of the crime.[28] When Branham chided him for failing to tell earlier of his involvement in the crime, the petitioner, according to Branham, said, "I thought I could fool you."[29] On the other hand, the petitioner denies that he admitted the crime to Branham. According to petitioner, when he had shown Branham the "place", Branham promptly said he would be able to "clear" the petitioner.[30] However, Branham's testimony to the contrary is given confirmation by the fact that, immediately after his meeting with the petitioner, he communicated with Agnew, told him that the petitioner admitted his guilt, had taken him (Branham) to the place of the crime, wanted to plead guilty, and wished the two of them to resume his representation and seek leniency for him upon his plea.[31] At any rate, they resumed representation under the assumption that the petitioner intended to plead guilty;[32] and they testified that thereafter the petitioner did not indicate to them any other desire.[33]

On Tuesday, November 9, the Solicitor advised petitioner and his counsel that he wished to dispose of the case on the next day, Wednesday, November 10.[34] That night, the petitioner claimed he had what he described as a "heart disaster". It seemed that he had had some prior record of heart trouble (petitioner described his condition as "blister of the heart") and had at times undergone treatment for such condition.[35] He was admitted to the Oconee Hospital, where his condition was diagnosed as "peptic ulcer". At

19. See pp. 102, 124, 143, State Transcript.

20. See p. 126, State Transcript.

21. See p. 125, State Transcript.

22. See pp. 109–10, 142, State Transcript.

23. See p. 129, State Transcript.

24. See p. 128, State Transcript.

25. See p. 102, State Transcript.

26. See p. 60, State Transcript.

27. See pp. 102–4, State Transcript.

28. See pp. 119, 123, State Transcript. Cf., United States ex rel. Richardson v. Mc-

Mann (C.C.A.N.Y.1969) 408 F.2d 48, 53; United States v. Kendrick (C.C.A.N.C. 1964) 331 F.2d 110, 113–114.

29. See pp. 119, 129–30, State Transcript.

30. See pp. 18–9, State Transcript.

31. See p. 140, State Transcript.

32. See p. 128, State Transcript.

33. See p. 141, State Transcript.

34. See p. 167, State Transcript.

35. See p. 159, State Transcript.

about 2:30 a. m. on the morning of November 10, the petitioner was given a sedative to aid him in sleeping. The sedative was "a noludar 300", described in the testimony as a "non-narcotic", whose normal range of effect would be about four hours and whose maximum was eight hours.[36] When the Court convened the next morning, the Solicitor was told that the petitioner was in the hospital.[37] He brought the matter to the attention of the Court and requested a medical examination to determine whether the petitioner was mentally and physically competent to stand trial.[38] As a result of such request, Dr. Edward N. Davis, the county physician, was sent to the hospital to examine the petitioner.[39] Petitioner contended Dr. Davis merely looked at him and told him he was able to stand trial. Dr. Davis, on the other hand, testified that at about 10:45 a.m.,[40] he gave the petitioner a thorough examination, followed by a review of his heart tracings and x-rays.[41] He, also, testified that he inquired into the medications administered to the petitioner during the latter's stay in the hospital. He said the records, as he recalled them, indicated that he received a sleeping pill "at about eleven o'clock".[42] He was, however, somewhat indefinite on the time such sleeping pill was given the petitioner, remarking in that connection that "I can check that if you want me to."[43] In describing petitioner's mental condition at the time of this examination (which was slightly more than eight hours after the hospital records showed the medication was given), Dr. Davis said he "found no evidence of his having sedation at the time I examined the patient."[44] He was positive in his opinion that the petitioner was in full possession of his mental faculties.[45] Petitioner gave "cogent answers" to all questions,[46] "showed no evidence of a psychosis", and "was oriented as to time and place"[47] in his examination by Dr. Davis. Moreover, before reporting to the Court, Dr. Davis reviewed his conclusions with Dr. Shuler, who was petitioner's family physician, and who had seen the petitioner at 7:30 that morning. He received from Dr. Shuler confirmation of his diagnosis.[48] It might be noted, too, that petitioner was later examined at the State Penitentiary some time after his sentence and a diagnosis of heart trouble was made but no evidence of any mental disorder was discovered.[49]

Dr. Davis advised the Court informally of his conclusion that the petitioner was both physically and mentally competent to stand trial,[50] and later, at the instance of the Solicitor, his conclusions were incorporated in the record of his sentence.[51] The petitioner was then sent for. When petitioner arrived at court, he was met by his counsel and entered his plea of guilty. This must have been roughly about noon. He contended that he told his counsel at this time that he did not wish to plead guilty. Both counsel deny this, stating that from Sunday night on the petitioner indicated to them his desire to plead guilty. At any rate, at the hearing in Court, as shown by the Court transcript, petitioner, both in person and by counsel stated his desire to plead guilty. Both of his counsel and the Solicitor testified that his every action at this time indicated petitioner was in full possession of his faculties and understood

36. See pp. 146–7, State Transcript.

37. See pp. 167–8, State Transcript.

38. See p. 169, State Transcript.

39. See pp. 144–5; State Transcript.

40. See p. 146, State Transcript.

41. See pp. 145–6, State Transcript.

42. See p. 146, State Transcript.

43. See p. 146, State Transcript.

44. See pp. 147–8, State Transcript.

45. See pp. 148, 163 State Transcript.

46. See p. 149, State Transcript.

47. See p. 150, State Transcript.

48. See pp. 151–2, State Transcript.

49. See p. 156, State Transcript.

50. See pp. 153–4, 162, State Transcript.

51. See pp. 162, 170, State Transcript.

what he was doing.[52] The Presiding Judge was particularly vigilant in his exacting interrogation of both counsel and petitioner to ascertain that petitioner's plea was voluntarily and intelligently entered. In such interrogation, the Court met fully the strict requirements subsequently mandated in Boykin v. State (1969) 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274. It is true that the petitioner disclaimed any recollection of his interrogation by the Court, explaining that "I was scared and I don't remember what the Judge did say to me."[53] He did admit he did not tell the Court he did not want to plead guilty[54] and he specifically refused to testify that he was not in full possession of his faculties at the time.[55] He admitted at one point in his testimony that he knew what was going on during his plea.[56] And it is significant that he remembered many of the details of the hearing at which he entered his plea. He recalled that both his counsel and his wife made appeals for leniency on his behalf and remembered that the Probation Officer was present, though he professed to be unsure what such Officer said to the Court but did concede that he thought the Court asked him "something about my record, my back record."[57]

Another fact which casts a doubt on petitioner's claim that he did not intend to plead guilty or understand that he was so pleading was the second ground of his petition for relief. He urged that he was induced to enter his plea by the assurance of his counsel that his sentence would be imprisonment for ten years.[58] Such a contention necessarily assumes that the petitioner agreed to the guilty plea and offers a reason for

such plea. By this claim, petitioner affirms that he actually intended to and did knowingly plead guilty. In short, the two claims asserted by him for relief in *habeas corpus* are contradictory.

Counsel themselves testified positively that neither at any time had given any assurance to the petitioner of the sentence that would be imposed.[59] Nor did petitioner testify that either the Solicitor or the Court indicated at any time prior to entry of his sentence what petitioner's sentence would be. In fact, the Solicitor was positive in his testimony that he had no such communication with anyone.[60]

After the entry of his plea, the petitioner admitted he was perfectly satisfied with the representation his counsel had given him[61] and the action taken, until the next morning when he ascertained from a fellow jail inmate that he "might have had a defense to these charges" by demanding the right to a "thirty (30) day (mental) observation."[62] It may be remarked parenthetically that, like so much "jail-house" law, there was little to this suggestion. The petitioner, while claiming that he had experienced "black-out spells", identified them as "heart blisters". He had never had any psychiatric examinations[63] and there was no record of insanity in his family.[64] Since his plea, he has never suggested and makes no contention now, so far as the record in either the State Court or in this Court shows, that he has any mental disability. In such a situation, it is doubtful that any court would have accorded him a thirty-day period of observation, and, if it had, it would undoubtedly not have resulted in any con-

---

52. See pp. 130, 141, 170, State Transcript.

53. See p. 48, State Transcript.

54. See p. 193, State Transcript.

55. See p. 28, State Transcript.

56. See p. 46, State Transcript.

57. See p. 49, State Transcript.

58. See p. 30, State Transcript.

59. See pp. 106, 141, State Transcript.

60. See p. 185, State Transcript. See, also, United States v. Baysden (C.C.A.N.C. 1964) 326 F.2d 629, 631, note 3; United States ex rel. Toland v. Phimister (D.C. N.Y.1969) 296 F.Supp. 1027, 1029.

61. See pp. 39, 44, State Transcript.

62. See p. 34, State Transcript.

63. See pp. 62, 63, State Transcript.

64. See p. 82, State Transcript.

clusion that petitioner was mentally irresponsible. Under the most favorable circumstances, such an observation would have operated merely to secure a delay for the petitioner; it would not have resulted in a defense.

On the basis of this evidentiary hearing, which met all the standards for a full and fair hearing as stated in Townsend v. Sain (1963) 372 U.S. 293, 322, 83 S.Ct. 745, 9 L.Ed.2d 770, the State Court entered careful, exhaustive and reliable findings sustaining the voluntariness of petitioner's plea. Specifically, the Court found that the petitioner was in full possession of his faculties, understood what he was doing and freely entered his plea of guilty. Such findings are amply supported by the record. Petitioner proceeded to appeal this decision, but, *on his own motion*, that appeal was dismissed.[65]

The petitioner then filed his proceeding in this Court, contending that he had exhausted State remedies.

Counsel was duly appointed to represent the petitioner in this Court. In addition to the grounds raised in the State proceedings, counsel for the petitioner in this Court raised the issue of the voluntariness of petitioner's plea in the light of the recent decision in United States v. Jackson (1968) 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138. Because this issue had not been considered by the State Court, the cause was remanded to the State Court for consideration of this new issue. Counsel was appointed by the Court. Such counsel was advised by the petitioner that he was fully satisfied with the representation given him by Mr. Branham and Mr. Agnew.[66] That Court ruled against the petitioner on this new issue. His court-appointed counsel in-

quired whether petitioner wished him to appeal this ruling. Petitioner advised him he did not wish him to appeal and proceeded to renew his proceedings in this Court.

While the extensive hearings had in the State Court and the reliable findings made by such Court, supported as they were by the evidence, well justified this Court in denying an evidentiary hearing to the petitioner in this Court,[67] an evidentiary hearing was had in this Court and full opportunity given the petitioner to offer any additional evidence he desired.

The petitioner, by his evidence in this Court, sought anew to challenge the finding of the State Court that he competently entered his plea. Specifically, he attacked Dr. Davis' testimony, contending that Dr. Davis had "perjured" himself by testifying that petitioner was given a sleeping pill at about 11:30 p. m. on Tuesday night when the hospital records showed that the pill was given at 2:30 a. m. on Wednesday morning. He, also, offered an affidavit that the sleeping pill administered to the petitioner at 2:30 a. m. could have an effect for as long as eight hours.

I find nothing in these new arguments of the petitioner to invalidate the well-reasoned findings of the State Court, in which, upon careful examination of the record, I concur. Dr. Davis, in his testimony about the time the petitioner received his sleeping medication, indicated that he was merely giving his best recollection of an entry in petitioner's hospital chart and advised the Court and parties that, if the time was important, he could ascertain from the hospital records the exact time the medicine was given. No request was made that Dr. Davis examine the rec-

---

65. See Return of State.

66. See testimony of Howard Pettit, appointed counsel.

67. See Section 2254(e), 28 U.S.C.; Dickerson v. State of Alabama (C.C.A.Ala. 1969) 412 F.2d 1183, 1184; United

States ex rel. Lo Piccolo v. LaVallee (C.C.A.N.Y.1967) 377 F.2d 221, 222, cert. denied 389 U.S. 870, 88 S.Ct. 148, 19 L.Ed.2d 148; Dixon v. State of South Carolina (D.C.1967) 272 F.Supp. 674, 676.

ords. Petitioner had already fixed the time that he took the pills as 2:30 a. m. It had, also, been established that, Dr. Davis examined the petitioner at the instance of the Court at about 10:30 a. m. on the same day, or eight hours after the petitioner himself testified he had taken the medication. The entry of his plea could not have occurred much before noon or about ten hours after the medication had been given. All witnesses agreed that the maximum time effect of such medication was eight hours. Accordingly, when Dr. Davis examined the petitioner and when later he was taken to Court, the effects of his medication had been fully dissipated.[68] And this was confirmed by Dr. Davis' diagnosis that at his examination of petitioner he noted no effects of sedation in the mental reactions of petitioner and found the petitioner in full possession of his faculties.

Perhaps some special comment should be made of the application of *Jackson*. That case, it was held in Alford v. North Carolina (C.C.A.N.C.1968) 405 F.2d 340, 347, rendered a guilty plea in a capital case involuntary if the defendant's "principal motivation to plead guilty or to forego a trial by jury was to avoid the death penalty." The petitioner in this case, though he testified that his attorneys raised the threat of the death penalty in their discussion of his plea with him, was positive and unequivocal that he was never in fear of the death penalty.[69] It is plain by petitioner's own testimony that the fear of a death penalty was not the "principal motivation"—in fact, by his account, was no part of the motivation— of his plea. Accordingly, *Jackson*, announced after the entry of his plea, cannot comfort petitioner in his application for relief.

Appointed counsel for the petitioner is to be particularly commended for the able manner in which he has presented the petitioner's case. He has shown great diligence in developing every possible means of aiding the petitioner. The Court is grateful to him.

The petition is without merit and is hereby dismissed.

And it is so ordered.

---

68. See p. 147, State Transcript.

69. See p. 59, State Transcript.